### PEOPLE *v.* HOEK.

1. CRIMINAL LAW—DISORDERLY HOUSE—LANDLORD AS KEEPER—INFORMATION—DUPLICITY.

   Respondent, as landlord of a disorderly house, was properly convicted of maintaining a house of ill-fame under 3 Comp. Laws, § 11697, instead of being convicted of a violation of section 11699, prohibiting persons from knowingly leasing a dwelling house for such purposes, under testimony tending to show that he kept a key of the building, had the right of entry and managed and cared for the premises which he let as separate rooms to disorderly persons, and that he sent customers to the tenants who committed lewd and improper acts.

2. SAME—INFORMATION—JOINDER OF OFFENSES.

   It would be permissible to join both offenses in one proceeding if the facts tended to show violations of the two sections.

3. SAME—LANDLORD AND TENANT—STATUTES.

   A landlord who occupies no part of a house, keeps no key, does not reserve right of entry or take part in the unlawful management and control of premises, cannot be convicted of keeping a bawdy-house therein.

4. SAME.

   But if he aided and abetted, countenanced or advised others in the management of a house of ill-fame, he was equally guilty and could be tried as a principal.

5. TRIAL — PROSECUTING ATTORNEY — CONDUCT OF COUNSEL — APPEAL AND ERROR.

   Comments of the prosecuting attorney to witnesses and to the court during the progress of the trial, while objectionable, were not of such a prejudicial character as to require the reversal of the conviction, where the trial court intervened upon occasions that required it and ruled that the remarks were improper.

6. SAME—REQUESTS TO CHARGE.

   It is not error to refuse specific requests if the charge as given brings out the same point clearly and definitely.

Error to the superior court of Grand Rapids; Stuart, J.

Submitted January 18, 1912. (Docket No. 152.) Decided March 12, 1912.

Paul Hoek was convicted of keeping a house of ill-fame. Affirmed.

*Richard L. Newnham*, for appellant.

*Franz C. Kuhn*, Attorney General, and *William B. Brown*, Prosecuting Attorney, for the people.

STEERE, J. The respondent was convicted, in the superior court of the city of Grand Rapids, of keeping a disorderly house at No. 105 Commerce street in said city on divers days between April 26, 1909, and March 1, 1910, in violation of section 11697, 3 Comp. Laws.

The testimony is undisputed that respondent had charge of the premises in question, and was known as the proprietor. There were 12 rooms in the building, and he rented them to various occupants. He resided elsewhere with his family. He carried a key to this building, and looked after it and conducted its affairs, managing it in a general supervisory way. He hired the help, which did the hall and room work, and had general control. He testifies:

"I had charge and supervision at that time, and I hired and paid the girls that cleaned the halls and took care of the building, and I went there every day and saw the building and paid the rent for the building, and had entire charge of the building just as though my wife and family lived there."

The prosecution introduced testimony of various witnesses tending to show that the place bore a bad reputation, being known as a house of ill-fame; that various women resided there who were prostitutes; and that persons of bad character and loose morals resorted there for purposes of prostitution and lewdness. There was direct and positive testimony as to the reputation of the house and conduct of its inmates, not only by witnesses who had personal knowledge and experience with what was being

done inside the building, but others who, through necessity, learned on the outside its reputation and something of the conduct of its inmates. Contractors, erecting buildings in the neighborhood, testified that they were annoyed by things which transpired there; that it bore the reputation of being a sporting house, and the women residing there communicated with, and attracted the attention of, men working in the neighborhood. There was also direct testimony as to acts of prostitution and lewdness in the building.

William Schroeder, who was in charge of contract work, erecting a building across the street from these premises, testifies:

"I knew what was going on upstairs in the two top stories over the store. * * * We had 20 or 30 carpenters working sometimes. The general reputation of Paul Hoek's, 105 Commerce street, was that it was a sporting house. There were girls over there that would open the windows and stick their heads out and annoy my men; they were in the top story, facing the south. I noticed that conduct going on between two and three months."

While respondent and his witnesses testify to the good reputation of the place and its inmates and no knowledge of any acts of impropriety committed there, it is not seriously contended by the defense that the question of whether it was a house of ill-fame, resorted to for purposes of prostitution and lewdness, was not a proper question for a jury; but it is urged that respondent is not shown to have been personally connected with, or responsible for, those things; he only renting rooms in the building to tenants from whom he received nothing by way of profit, except reasonable rent for the rooms. And it is urged that, should he be found to have had knowledge of, and permitted, the immoral conduct claimed, if guilty at all, he can only be convicted of letting or renting a dwelling house, knowing it was used as a house of ill-fame; that therefore he should have been prosecuted, if at all, under section 11699, 3 Comp. Laws, instead of section

11697; that the two statutes, taken together, clearly show it was the purpose of the lawmaking power to only punish persons who rented premises or buildings to another for unlawful purposes as a landlord, and not as a keeper, and respondent should have been placed on trial, if at all, only for the lesser offense.

There are 27 allegations of error, many of them directed to objections taken on the trial to the form and nature of questions asked and the conduct of the prosecuting attorney, and other matters claimed to be prejudicial to a fair trial; but those most seriously urged and worthy of consideration condense themselves to two propositions: The status of the respondent, under this charge, of being a keeper, instead of a landlord, and prejudicial remarks of the prosecuting attorney in examining witnesses and summing up the case to the jury.

The two sections to which attention is called involve the same offense against chastity, morality, and decency. To convict in either, it must be proven that a brothel is maintained at the place and during the time charged; the distinction and grade of offense depending on the relation the accused bears to it.

Section 11699 is directed against "any person who shall let any dwelling house knowing the lessee intends to use it as a house of ill-fame," etc., or shall receive rent for the same or knowingly permit it to be used for such purpose. Section 11697, under which respondent was convicted, is directed against and involves "every person who shall keep a house of ill-fame," etc. It can readily be conceived how a person might rent a house for such purpose, and then assist, aid, and abet the lessee in keeping and conducting the place for the unlawful purpose forbidden by both sections, thus at the same time being guilty of both offenses. Under the same state of facts tending to prove violation of both sections, it would be permissible to proceed against the alleged offender under either; and it has been held in a similar case that an indictment charging both offenses is not bad for duplicity.

Where two sections of a statute enacted at the same time separately provide punishment for keeping a house of ill-fame, one for "keeping a bawdy-house," and the other for "keeping and maintaining a nuisance," the offender can be proceeded against for either, or jointly charged with both. *Commonwealth* v. *Ballou*, 124 Mass. 26.

It is unquestionably true that a person who knowingly rents premises for such immoral purposes to others, and surrenders possession and control to them, taking no part in the maintenance and conduct of the place, cannot be convicted as a keeper, no matter how familiar such person might be with the fact that it was maintained as a disorderly house. A landlord who occupies no part of a house, nor keeps the key, nor reserves to himself any right of entry, and takes no part in the management and control, cannot be convicted of "keeping a bawdy-house." *Regina* v. *Stannard*, 9 Cox, Crim. Cases, 405.

But the testimony goes much further in this case. Although respondent sublet rooms in the building to tenants, he kept a key to the building, reserved to himself the right of entry, managed, controlled, and cared for the premises. He "had entire charge of the building just as though my wife and family lived there." An inmate, who testified that she was "sporting" and "hustling, making money for myself," and "everybody there was doing the same thing," also gave evidence that respondent knew what she was doing, "because he sent me men over there." Without further referring to the testimony in detail, we think there was abundant evidence along these lines, direct and indirect, tending to show that defendant actively participated and assisted in running this establishment as a place trafficking in licentiousness, to justify the court in submitting to the jury the question of his guilt, either as a keeper, or as one aiding and assisting the individual keepers of the various rooms where the immoral business was carried on and stamped the place with its offensive characteristics.

If respondent aided and abetted, countenanced and advised, others in the management and control of this house as a house of ill-fame, he would be equally guilty with them. Persons who assist, aid, and abet others in the commission of crime are equally guilty, and may be tried as principals. *People* v. *Sligh,* 48 Mich. 54 (11 N. W. 782); *People* v. *Wright,* 90 Mich. 362 (51 N. W. 517); *Commonwealth* v. *Gannett,* 1 Allen (Mass.), 7 (79 Am. Dec. 693).

There are numerous assignments of error, based on alleged prejudicial conduct of the prosecuting attorney, which it is claimed prevented a fair trial. Several of them are entirely without basis according to the record.

It is claimed that unfair and insinuating questions were asked witnesses, and unsupported and intemperate comments made. The case was tried with some acerbity on both sides, and numerous objections, interruptions, and arguments intervened all through the progress of the trial. The evidence was extremely conflicting on matters where it is manifest certain witnesses on one side or the other knowingly testified falsely. In such cases, the manner of examining witnesses and general conduct of the trial must necessarily be left to the discretion of the trial judge. We think in this case the court did not abuse this discretion.

While arguing to the court objections made to certain of his questions, the prosecuting attorney, on two occasions, made the following remarks, which are particularly urged as so prejudicial to a fair trial as to call for reversal:

"Here are these witnesses. I am simply trying to show what we are contending with. Now, here is a girl that says she never saw a dishonest act or an immoral act. Now, the very deportment of the girl, how she is conducting herself, if the jury could see it as to how it should be understood—" Here counsel for the defense. interposed, "I take exception to this harangue of the prosecuting attorney."

At the conclusion of an animated discussion between counsel, the court ruled, "I do not think that would be proper," and the incident closed. In arguing a later objection, the prosecuting attorney said:

"I am talking to the court now, and I want to make this suggestion, your honor, that in 17 years of presenting this kind of cases to the court I have never yet seen a case where the proprietor came into the room and held a light, so he could be present. These girls there, and their appearance and their suggestions, is what constitutes prostitution."

To which remarks exceptions were taken, and after argument the court said: "I think it is irrelevant." We do not think that such remarks, made in the heat of trial, in the midst of a series of objections, though, perhaps, indiscreet and improper, when ruled upon adversely by the court, could so seriously affect the course of the trial as to amount to reversible error.

On cross-examination of the defendant, touching a license being refused him by the city council, in reply to the question whether there was more than one reason, he said, "I don't think I will have any trouble, Mr. B., getting my license after today." To this the prosecuting attorney replied: "No; I don't think you will have any chance." Objection was made and exception taken to this remark, and the court at once ruled that it was objectionable. The witness' irresponsive answer, volunteering the opinion that he was about to be acquitted, naturally suggested the retaliatory retort. It was improper and objectionable, and the court so ruled. We think that the ruling cured any prejudicial effect which might be inferred from such ill-advised exchange of views between witness and counsel.

Error is assigned on the refusal of the court to give certain of respondent's numerous requests to charge. The charge as a whole is very clear and complete. We think it covers the essential propositions contained in the requests

refused.   Complaint is made of failure to give the following portion of respondent's fifteenth request:

"So that I charge you that, unless you find, beyond a reasonable doubt, that said house was offensive in this regard in the vicinity in which it is situated, then you cannot convict the respondent, and your verdict should be: Not guilty."

An examination of the charge shows that the court very fully and emphatically instructed the jury on the necessity of proving all material facts beyond any reasonable doubt, before conviction could be had; and in another portion of the charge, where the court was explaining the significance of "reputation," he twice told them, among other things, that it meant "in the vicinity."  It is not error to refuse specific requests, if the charge as given brings out the same point clearly and definitely.  *People* v. *Sligh*, 48 Mich. 58 (11 N. W. 782), and many other familiar cases too numerous to mention.

A review of the record in this case as a whole leads to the conclusion that the court preserved to respondent all his legal rights during the progress of the trial, and fully and very fairly instructed the jury as to their duty in passing upon the testimony submitted to them.

We find no reversible error, and the conviction is affirmed.

MOORE, C. J., and McALVAY, BROOKE, BLAIR, STONE, and OSTRANDER, JJ., concurred.  BIRD, J., did not sit.